**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

11 CV 1751

------------------------------------------------------------x

WIRELESS INK CORPORATION,

                   Plaintiff,

        -against-

FACEBOOK, INC.; GOOGLE, INC.,
YOUTUBE, INC.; YOUTUBE, LLC;
and MYSPACE, INC.

                   Defendants.

------------------------------------------------------------x

No.

**COMPLAINT FOR**
**PATENT INFRINGEMENT**

RECEIVED
MAR 15 2011
U.S.D.C. S.D. N.Y.
COMPLETED

**ECF CASE**

**DEMAND FOR JURY**
**TRIAL**

## COMPLAINT

Plaintiff Wireless Ink Corporation ("Wireless Ink"), by its attorneys The Pitcock

Law Group, for its Complaint against defendants Facebook, Inc., Google, Inc., YouTube, Inc.,

YouTube, LLC and MySpace, Inc. (collectively, the "Defendants") respectfully alleges as

follows:

## NATURE OF THE ACTION

1.     This is an action for patent infringement. Founded in 2001, Plaintiff

Wireless Ink has been widely recognized as an early innovator in the field of mobile content

management and social networking software. Wireless Ink is the owner of all right, title and

interest in and to U.S. Patent No. 7,908,342 B2 ("the '342 patent" or "patent-in-suit") entitled

"Method, Apparatus and System for Management of Information Content for Enhanced

Accessibility over Wireless Communication Networks," which was duly and legally issued on

March 15, 2011.

2. On information and belief, and as alleged in more detail below, Defendants have been actively infringing and inducing others to infringe the '342 patent with knowledge of Wireless Ink's patent rights and without reasonable basis for believing their conduct to be lawful. .

3. The Defendants have also violated Plaintiff's provisional patent rights pursuant to 35 U.S.C. § 154(d). The '342 patent issued from U.S. Patent Application.No. 12/548,928, which was published by the Patent and Trademark Office on February 18, 2010. The application that issued as the '342 patent was a continuation of U.S. Patent Application No. 10/464,526, filed on June 18, 2003 (now Patent No. 7,599,983), which claims priority to Provisional Application No. 60/389,430, filed on June 18, 2002.

4. Wireless Ink provided the Defendants with actual notice of the patent application prior to issue. Plaintiff sent letters to the general counsel for each of the Defendants by Federal Express on February 23, 2011, notifying Defendants of their infringement of the pending '342 patent. True and correct copies of the letters to the Defendants are attached to this Complaint as Exhibit A. The patent application was published with claims substantially identical to those in the issued patent. Therefore, on information and belief, the Defendants had actual notice from at least the date of receipt of the letters in Exhibit A.

5. In addition, the parent to the '342 patent, Patent Application No. 10/464,526, which issued as U.S. Patent No. 7,599,983 B2 ("the '983 patent,") is the subject of litigation currently pending against defendants Facebook, Inc. and Google, Inc. Both of those defendants were made aware of the notice of allowance of the claims of the '342 patent-in-suit via letter to the Court dated January 21, 2011. A true and correct copy of that letter is attached to this Complaint as Exhibit B. As noted in that letter, all prior art identified by these Defendants in

2

the previous litigation was cited to the Patent and Trademark Office during prosecution of the '342 patent, and the claims were allowed over all such art.

6.     On information and belief, Defendants have purposefully and deliberately committed acts of patent infringement within the State of New York, and particularly within the Southern District of New York, and are thus liable to Wireless Ink for infringement of the patent at issue in this litigation pursuant to 35 U.S.C. § 271.  Because Defendants' infringement has been and continues to be willful and deliberate, Wireless Ink is further entitled to an award of enhanced damages from this Court.

## JURISDICTION AND VENUE

7.     This is an action arising under the patent laws of the United States, Title 35 of the United States Code §§ 101, *et. seq*.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (action arising under an Act of Congress relating to patents).

8.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).

9.     Defendants are doing business within the United States, including within this Judicial District.  On information and belief, Defendants have committed numerous acts of infringement in this Judicial District and throughout the United States.

## PARTIES

10.     Plaintiff Wireless Ink is a Delaware Corporation with its principal place of business in East Islip, New York.

11.     On information and belief, Defendant Facebook, Inc. ("Facebook") is a Delaware Corporation with its principal place of business in Palo Alto, California.

3

12.     On information and belief, Defendant Google, Inc. ("Google") is a Delaware Corporation with its principal place of business in Mountain View, California.

13.     On information and belief, Defendants YouTube, Inc. and YouTube, LLC (collectively, "YouTube") are Delaware Corporations, both having their principal places of business in San Bruno, California.

14.     On information and belief, Defendant MySpace, Inc. ("MySpace") is a Delaware Corporate with its principal place of business in Beverly Hills, California.

15.     On information and belief, Defendants have committed acts defined as unlawful under 35 U.S.C. §§ 271 and 154(d), including in this Judicial District, as alleged more fully below.

## FACTUAL ALLEGATIONS

### A.     INFRINGEMENT BY DEFENDANTS

16.     As detailed below, and without prejudice to asserting other claims of the '342 patent, on information and belief, the Defendants directly infringe as alleged in detail below.

### I.     Facebook's Direct Infringement

17.     Facebook provides at least one content management web site identified by a first uniform resource locator and accessible to a user of the communications system at the domain www.facebook.com.

18.     Facebook generates mobile web sites identified by a second uniform resource locator different than the first uniform resource locator at, for example, m.facebook.com and touch.facebook.com (collectively, the "Facebook mobile web sites"). The Facebook mobile

4

web sites are accessible independently of the content management web site via one or more mobile devices.

19.     The Facebook mobile web sites are configured to receive data automatically from external data sources designated by the user at the content management web site. Facebook allows various types of external data to be designated by a user at its content management web sites, such as an RSS feed or a device-captured data source, such as a photo file.  On information and belief, at least some of the RSS feeds are XML documents. The Facebook mobile web sites are configured to receive data automatically from such external data sources designated by the user at the content management web site.

20.     The Facebook content management web site also permits the user to upload at least one information item.  The Facebook content management web site permits the user to select one or more information items from a listing of a plurality of information items. The Facebook mobile web sites will include such uploaded information items.

21.     The Facebook content management web site allows users to enter a message, for example, a Wall post.  The Facebook mobile web sites will include the entered messages.

22.     Thus, on information and belief, Facebook directly infringes at least claims 1, 2, 3, 5, 6, 7, 9, and 11 of the '342 patent.

## II.     Google's Direct Infringement

23.     Google provides at least one content management web site identified by a first uniform resource locator and accessible to a user of the communications system at the domain www.google.com.

5

24.     Google generates mobile web sites identified by a second uniform resource locator different than the first uniform resource locator at, for example, m.google.com (for Buzz) and www.google.com/reader/m (for Google Reader) (collectively, the "Google mobile web sites.") The Google mobile web sites are accessible independently of the content management web site via one or more mobile devices.

25.     The Google mobile web sites are configured to receive data automatically from external data sources designated by the user at the content management web site(s). For example, Google Buzz (within Gmail at mail.google.com) allows a user to designate photo files and other external data sources, such as RSS feeds. These data sources can be designated directly in Buzz, or from other locations, such as Google Reader, Google Profiles or Picassa. Google Reader at www.google.com/reader (independently from Buzz and Gmail), allows a user to designate various external data sources, such as RSS feeds and photo files. On information and belief, at least some of the RSS feeds are XML documents.

26.     The Google content management web site(s) permit the user to upload at least one information item. The Google content management web site permits the user to select one or more information items from a listing of a plurality of information items. The Google mobile web sites will include such uploaded information items.

27.     The Google content management web site allows users to enter a message, for example, a Buzz post or Google Reader note. The Google mobile web sites will include such entered messages.

28.     Thus, on information and belief, Google directly infringes at least claims 1, 2, 3, 5, 6, 7, 9, and 11 of the '342 patent.

### III.    YouTube's Direct Infringement

29.    YouTube provides at least one content management web site identified by a first uniform resource locator and accessible to a user of the communications system. At least one such content management web site is provided to each user at the domain www.youtube.com.

30.    YouTube generates a mobile web site identified by a second uniform resource locator different than the first uniform resource locator at, for example, m.youtube.com (the "YouTube mobile web site.") The YouTube mobile web site is accessible independently of the content management web site via one or more mobile devices.

31.    The YouTube mobile web site is configured to receive data automatically from external data sources designated by the user at the content management web site. A YouTube user can designate an external data source that is a device-captured data source, such as a video file.

32.    The YouTube content management web site permits the user to upload at least one information item. The YouTube content management web site permits the user to select one or more information items from a listing of a plurality of information items. The YouTube mobile web sites will include such uploaded information items.

33.    The YouTube content management web site permits the user to enter a message (for example, a message about a video or comments to videos) and the YouTube mobile website includes the entered message.

34.    Thus, on information and belief, YouTube directly infringes at least claims 1, 5, 7, 9, and 11 of the '342 patent.

7

## IV.    MySpace's Direct Infringement

35.    MySpace provides at least one content management web site identified by a first uniform resource locator and accessible to a user of the communications system. At least one such content management web site is provided to each user at the domain www.myspace.com.

36.    MySpace generates a mobile web site identified by a second uniform resource locator different than the first uniform resource locator at, for example, m.myspace.com (the "MySpace mobile web site.") The MySpace mobile web site is accessible independently of the content management web site via one or more mobile devices.

37.    The MySpace mobile web site is configured to receive data automatically from external data sources designated by the user at the content management web site, such as an RSS feed. *See* www.myspace.com/rssreader. On information and belief, at least some of the RSS feeds are XML documents. A MySpace user can designate an external data source that is a device-captured data source, such as a photo file. The MySpace mobile web site is configured to receive data automatically from such external data sources designated by the user at the content management web site.

38.    The MySpace content management web site permits the user to upload at least one information item. The MySpace content management web site permits the user to select one or more information items from a listing of a plurality of information items. The MySpace mobile web sites will include such uploaded information items.

39.    The MySpace content management web site allows users to enter a message. The MySpace mobile web sites will include the entered messages.

40.     Thus, on information and belief, MySpace directly infringes at least claims 1, 2, 3, 5, 6, 7, 9, and 11 of the '342 patent.

## B.     DEFENDANTS' USE OF THE PATENTED TECHNOLOGY

41.     On information and belief, Google CEO Eric Schmidt announced at the Mobile World Congress 2010 in Barcelona that Google would begin following a "Mobile First" philosophy. Schmidt recently announced in 2011 that mobile use is growing faster than all of Google's internal predictions in a keynote speech given at the Internet Advertising Bureau's Annual Leadership meeting, with YouTube seeing 200 million mobile playbacks a day.

42.     Karim Temsamani, Google's first-ever head of mobile advertising, began his job in or about October of 2010. *See* http://www.reuters.com/article/2011/02/07/us-google-mobile-idUSTRE71645V20110207. On information and belief, Temsamani stated recently that "I don't see any reason why mobile advertising won't be relevant to every single advertiser."

43.     On information and belief, shortly before issuance of the patent-in-suit, Google reached out to some of its top advertising customers to promote its mobile marketing services. On information and belief, Google held an event with advertising clients in New York shortly before the issue date of the patent-in-suit to showcase ways in which advertisers can extend marketing campaigns with mobile-specific features such as click-to-call ads, and how marketers can track the effectiveness of mobile campaigns. On information and belief, Google plans to have more such events with advertisers around the world.

44.     On information and belief, Google stated in or about October of 2011 that its mobile ad business was generating revenue at an annualized run rate of more than $1 billion. On information and belief, Google and Apple both tried to acquire mobile advertising firm AdMob in 2010, with Google's $750 million bid ultimately winning.

45.     On information and belief, Temsamani recently said the market for mobile advertising is currently growing so fast that there is sufficient room for both Google and Apple to thrive. On information and belief, according to Google, searches on mobile devices with full-fledged Web browsers increased by a factor of four in 2010.

46.     On information and belief, YouTube, which is owned by Google, embarked on a broad rollout of advertising on m.youtube.com in 2010. On information and belief, static banners appear at the top of the m.youtube.com homepage, browsing pages and search results pages.

47.     On information and belief, Taylor Cascino (Strategic Partner Development Manager at YouTube) said in a blog post on March 10, 2010 that "[mobile advertising on YouTube] is a wonder-working way for advertisers to reach YouTube viewers across multiple platforms" and that at launch "YouTube will immediately provide one of the largest audiences for a mobile ad campaign anywhere on the mobile web."

48.     On information and belief, Shishir Mehrotra (YouTube's director of monetization) stated that advertising on the YouTube mobile web site would "cater to one of the largest audiences for a mobile ad campaign anywhere on the mobile Web."

49.     On information and belief, MySpace launched an ad-funded mobile website in late 2007. John Smelzer, then senior vice president of mobile at Fox Interactive (MySpace is a subsidiary) stated at launch "[a]ccessing the Internet from your mobile phone will soon be as common as text messaging and voice calling" and that "[i]t's our belief that this mobile Web experience should be ad-supported and free to users." Chris DeWolfe, CEO and co-founder of MySpace, stated that an "ad-supported MySpace offering is a major component of our

mobile monetization strategy and we look forward to broadly offering this industry leading roll-out to advertisers."

50.     On information and belief, in late 2010, MySpace and Google came to a multi-year agreement to renew and expand their long-standing search and advertising relationship. On information and belief, under the terms of the new agreement, Google will continue to power MySpace search and search advertising and will also provide additional display advertising services to MySpace.

51.     On information and belief, on or about January 25, 2011, Facebook chief technology officer Bret Taylor said that his primary focus in 2011 will be building out the Facebook mobile presence. On information and belief, in or about November of 2010, Facebook announced that it had 200 million users accessing the site via mobile devices.

52.     On information and belief, Facebook recently acquired mobile advertising startup Rel8tion to boost the company's stance in the growing mobile advertising market.

53.     According to leading market research, by 2013 mobile phones will overtake PCs as the most common Web access device worldwide. *See* http://www.gartner.com/it/page.jsp?id=1278413. The number of mobile websites has grown more than 2000% since 2008. *See* http://www.bizreport.com/2010/10/dotmobi-2000-growth-in-number-of-mobile-ready-websites.html.

54.     UK firm Coda Research Consultancy forecasts that the amount of data traffic going over cellular networks is expected to grow 40-fold over the next five years. Coda expects that, in the U.S. alone, mobile handset data traffic will grow from 8 petabytes/month this year to 327 petabytes/month in 2015, which translates into a 117-percent compound annual growth rate.

## C.     WIRELESS INK'S USE OF THE PATENTED TECHNOLOGY

55.     Wireless Ink filed U.S. provisional application serial no. 60/389,430 on June 18, 2002. Wireless Ink filed patent application no. 10/464,526 on June 18, 2003, claiming the priority of the U.S. provisional application. That application, which later issued as the '983 patent, was first published and made publicly available by the Patent and Trademark Office on January 22, 2004.

56.     Around the time the first patent application was filed, Wireless Ink began running Winksite, a web site that allows individuals to create mobile websites such as those described in the pending patent application. *See* http://harper.wirelessink.com/2004/02/24/the-winksite-story/. At all times, Winksite described its mobile web site technology as "Patent Pending." The day the '342 patent issued, the Winksite web sites were updated and marked with the '342 patent number.

57.     Winksite continues to provide its mobile website technology to this day and had more than two million anonymous unique visits between January 1, 2010 and December 31, 2010, averaging more than 6,500 visitors per day. According to analytics from AdMob, Inc (the mobile advertising and analytics service acquired by Google), Winksite had over 21,120,738 visits during this same time period. Winksite has over 95,000 registered users.

58.     Winksite has long been recognized as a leader in mobile web site creation and has been widely acknowledged as such within the industry. *See, e.g.,* Beyond 3G: Bringing Networks, terminals and the Web together (Martin Sauter 2009) (http://books.google.com/books ?id=1gMfAQAAIAAJ&q=winksite&dq=winksite&ei=Ka-bS6zpKY30Mr_fsdIH&cd=1); Handbook of Research on Web 2.0 and Second Language Learning (Michael Thomas 2009) ("Winksite allow users to build their own blogs, chat forums, conduct polls and create journals.

It is truly user-friendly...") (http://books.google.com/books?id=4tB82g0GuLAC&pg=
PT506&dq=winksite&ei=Ka-bS6zpKY30Mr_fsdIH&cd=2#v=onepage&q=winksite&f=false);
Mobile Internet For Dummies (Michael J. O'Farrell, John R. Levine, Jostein Algroy, James
Pearce and Daniel Appelquist 2008) ("Designing colorful mobile sites with Winksite.")
(http://books.google.com/books?id=YdpsXjAvuUIC&pg=PA210&dq=winksite&ei=Ka-
bS6zpKY30Mr_fsdIH&cd=3#v=onepage&q=winksite&f=false); Mac Life Magazine (2007)
("You can trick out your site with "channels" including a blog (either one hosted on Winksite or
a feed of your existing blog), RSS feeds, surveys . . .") (http://books.google.com/
books?id=wgIAAAAAMBAJ&pg=PA86&dq=winksite&ei=Ka-bS6zpKY30Mr_fsdIH&cd
=4#v=onepage&q=winksite&f=false); Nokia Smartphone Hacks (Michael Juntao Yuan 2005)
(http://books.google.com/books?id=qDiAAot3HjYC&pg=PA269&dq=winksite&ei=Ka-
bS6zpKY30Mr_fsdIH&cd=5#v=onepage&q=winksite&f=false); Hybrid Learning and Education
(Joseph Fong, Reggie Kwan, and Fu Lee Wang 2008) ("A popular and free Mobile 2.0 site
builder for teaching can be found at Winksite . . .") (http://books.google.com/books?id=
Cy0YwEofp2oC&pg=PA229&dq= winksite&ei=KabS6zpKY30Mr_fsdIH&cd=6#v=
onepage&q=winksite&f=false); Toys to Tools: Connecting Student Cell Phones to Education
(Liz Kolb 2008) ("Winksite is another Web 2.0 resource that allows anyone to build a mobile-
friendly website") (http://books.google.com/books?id=nwYmAQAAIAAJ&q=
winksite&dq=winksite&ei=Ka-bS6zpKY30Mr_fsdIH&cd=7); The Everything Blogging Book:
Publish Your Ideas, Get Feedback, and Create (Aliza Sherman Risdahl 2006)
(http://books.google.com/books?id=XLjFHaxhG18C&pg=PT313&dq= winksite&ei=Ka-
bS6zpKY30Mr_fsdIH&cd=8#v=onepage&q=winksite&f=false); Digital Engagement: Internet
Marketing That Captures Customers and Builds Brand Loyalty (Leland Harden and Bob Heyman

2009) ("Google has a page creator (www.pages.google.com) that works in XHTML, and independent developers such as www.winksite.com offer community and support.") (http://books.google.com/books?id=75GvZRRRZVkC&pg=PA90&dq= winksite&ei=Ka-bS6zpKY30Mr_fsdIH&cd=10#v=onepage&q=winksite&f=false); Jump Point: How Network Culture is Revolutionizing Business (Tom Hayes 2008) (". . . and the ability to build a mobile Web page using a service like Winksite, and you have the best of all worlds.") (http://books.google.com/books?id=bEHSnh12VXUC&pg=PA10&dq=winksite&lr=&ei=x7GbS 6fwFZ28M4uehJUH&cd=12#v=onepage&q=winksite&f=false); Information Tomorrow: Reflections on Technology and the Future of Public and Academic Libraries (Rachel Singer Gordon 2007) http://books.google.com/books?id=8mRBKOrURK8C&pg=PA227&dq =winksite&lr=&ei=x7GbS6fwFZ28M4uehJUH&cd=13#v=onepage&q=winksite&f=false).

59.     Moreover, David Harper, lead inventor of the '983 patent and one of the founders of Wireless Ink, is well known as an expert on mobile web site technology. He has been cited as a mobile web site expert by well known publications, such as the New York Times. *See, e.g.*, http://www.nytimes.com/2004/12/07/books/07cell.html.

60.     In 2005, David Harper helped found the New York chapter of Mobile Monday. Mobile Monday is a global community of mobile industry visionaries, developers and influentials across over 100 cities worldwide fostering cooperation and cross-border business development through virtual and live networking events to share ideas, best practices and trends from global markets.

61.     Through Mobile Monday events and other conferences around the country that drew thousands of attendees, David Harper touted the advanced mobile website technology of Winksite. Indeed, David Harper has served on panels that include persons who work on

mobile web site technology issues at both Google and Facebook, and *specifically discussed* the Winksite technology with those persons. *See* http://www.informationweek.com/ blog/main/archives/2007/06/good_web_sites.html;jsessionid=4GCYWY12Q3RRNQE1GHRSK HWATMY32JVN.

### D.   WILLFULNESS AND INDIRECT INFRINGEMENT

62.   At all times for close to a decade, Wireless Ink publicized to the world that the advanced mobile web site features of its Winksite mobile application were "patent pending." The first patent application covering the technology has been publicly available since 2004. The second patent application covering the technology has been available for more than a year. As alleged above, both the Winksite application and the lead inventor David Harper were well known, and their achievements and technology were published on many occasions.

63.   Moreover, Wireless Ink gave actual notice of the patent claims and infringement prior to issuance to all the Defendants, as shown in Exhibit A.

64.   Also, since March of 2010, Wireless Ink has been in a patent litigation regarding mobile websites with both Facebook and Google. During that litigation, Wireless Ink provided notice of its pending patent applications to both Facebook and Google, as shown in Exhibit B.

65.   The Defendants alleged infringing activities involve hundreds of millions of users and potentially billions of acts of infringement. Given the time and resources the Defendants have invested in their desktop and mobile web sites as well as their strategic importance, and given the well known nature of Winksite and the lead inventor of the patent, David Harper, on information and belief, the Defendants have long been aware of Wireless Ink's patent rights.

66. If the Defendants were not aware of Plaintiff's patent rights, despite the ramifications on a major segment of the Defendants' business, the pending litigation and the actual notice sent to the general counsel for each of the Defendants, on information and belief, this was solely due to a deliberate indifference on the part of Defendants to a known patent risk. Thus, on information and belief, Defendants had actual knowledge of the '342 patent and Defendants' infringement has been and continues to be willful, justifying an award of enhanced damages.

67. Furthermore, on information and belief, Defendants have actively encouraged users to use their mobile web sites, even after such actual knowledge of Wireless Ink's patent rights. Thus, on information and belief, Defendants are liable for inducing infringement of the '342 patent.

## FIRST CLAIM FOR RELIEF
### (Infringement of the '342 Patent)

68.     Wireless Ink repeats and realleges paragraphs 1 through 67 above as though fully set forth herein.

69.     On information and belief, Wireless Ink alleges that Defendants have directly infringed and are currently directly infringing claims of the '342 patent either literally or under the doctrine of equivalents, and/or have actively induced and are actively inducing others to infringe the '342 patent, by committing acts defined in 35 U.S.C. § 271 as unlawful. All such acts have been without authority or license from Wireless Ink.

70.     On information and belief, Wireless Ink gave actual notice of its patent application to the Defendants. Thus, Defendants are liable for pre-issuance damages pursuant to 35 U.S.C. § 154(d).

71.     On information and belief, Defendants' direct infringement and inducement of infringement of the '342 patent has been and continues to be willful and deliberate, and without regard for Wireless Ink's rights in the '342 patent.

## PRAYER FOR RELIEF

**WHEREFORE**, Wireless Ink prays for the following relief:

A.    A judgment by the Court that the Defendants infringe one or more claims of the '342 patent;

B.    A judgment by the Court that Defendants are liable for inducement of infringement of the '342 patent;

C.    A judgment by the Court that Defendants' infringement of the '342 patent has been and continues to be willful;

D.    An award of damages to compensate Wireless Ink for Defendants' infringement, including preliminary, pre- and post-judgment interests and costs, pursuant to 35 U.S.C. § 284;

E.    An award of damages to compensate Wireless Ink for Defendants' infringement prior to the issuance of the patent pursuant to 35 U.S.C. § 156(d);

F.    An award of treble damages based on the willfulness of Defendants' infringement, pursuant to 35 U.S.C. § 284;

G.    A judgment by the Court that this case is exceptional and for the Court to award Wireless Ink its reasonable attorney fees, disbursements, expert fees and costs in accordance with the law, including, but not limited to, 35 U.S.C. § 285;

H.    Preliminary and permanent injunctive relief; and

I.    For such other, further or different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Wireless Ink respectfully demands a trial by jury for all issues so triable in this action.

Dated: New York, New York
March 15, 2011

Respectfully submitted,

By: _____
Jeremy S. Pitcock (JP-4954)

**THE PITCOCK LAW GROUP**
1501 Broadway, 12th Floor
New York, NY 10036
(646) 571-2237

**Attorneys for Wireless Ink Corporation**